Receipt number 9998-4653043

FILED

May 9 2018

U.S. COURT OF
FEDERAL CLAIMS

### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CHRISTY, INC.,<br>on behalf of itself and all others<br>similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | CASE NO.   18-657 C |

### CLASS ACTION COMPLAINT

Plaintiff CHRISTY, INC. (hereinafter, "Plaintiff" or "Christy") individually and on behalf of a class of all those similarly situated, by and through its undersigned counsel, files this Class Action Complaint against Defendant UNITED STATES OF AMERICA (hereinafter, "Defendant" or "United States").  Plaintiff alleges the following based on information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to itself.

# CONTENTS

NATURE OF THE ACTION ........................................................................................ 1

PARTIES ..................................................................................................................... 9

JURISDICTION AND VENUE .................................................................................. 10

CONSTITUTIONAL PROVISION ............................................................................ 10

CONTRACTS GIVING RISE TO JURISDICTION .................................................. 10

BACKGROUND INFORMATION ............................................................................ 12

    The Nature and Purpose of Patents ...................................................................... 15

    The Genesis Of "Maintenance Fees." .................................................................. 17

    Post Issuance Proceedings – IPRs, PGRs, and CBMs .......................................... 19

    Christy Obtains Patent No. 7,082,640 (hereinafter, the "'640 Patent") ................ 25

    Christy Loses Its Patent Claims Through The IPR Process .................................. 27

    The USPTO's Failure to Compensate ................................................................... 28

CLASS ACTION ALLEGATIONS ........................................................................... 28

COUNT I: TAKING OF PROPERTY WITHOUT JUST COMPENSATION ............ 32

COUNT II: BREACH OF CONTRACT ..................................................................... 36

COUNT III: BREACH OF IMPLIED IN-FACT CONTRACT .................................... 40

COUNT IV: BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR
    DEALING ............................................................................................................. 44

COUNT V: UNJUST ENRICHMENT ....................................................................... 46

COUNT VI: EXACTION ............................................................................................ 50

PRAYER FOR RELIEF ............................................................................................. 52

# INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A. | Brief for the Federal Respondent in Opposition to the Petition for A Writ of *Certiorari, Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, No. 16-712 (April 28, 2017) |
| B. | Brief for the Federal Respondent in Opposition to the Writ of *Certiorari, Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, No. 16-712 (October 23, 2017) |
| C. | Notice of Allowance and Fee(s) Transmittal form, USPTO Application No. 10/623,356 (March 2, 2006) |
| D. | U.S. Patent No. 7,082,640 (issued August 1, 2006) |
| E. | Notice of Payment of Fees for USPTO Application No. 10/623.,356 (May 31, 2006) |
| F. | Assignment of USPTO Application No. 10/623,356 by David McCutchen to Christy, Inc. (July 18, 2003) |
| G. | 3.5 Year Window Maintenance Fee Payment for U.S. Patent No. 7,082,640 (October 29, 2009) |
| H. | 7.5 Year Window Maintenance Fee Payment for U.S. Patent No. 7,082,640 (January 24, 2014) |
| I. | 11.5 Year Window Maintenance Fee Payment for U.S. Patent No. 7,082,640 (January 4, 2018) |
| J. | Summary of Maintenance Fee Payments for U.S. Patent No. 7,082,640 |
| K. | Petition for *Inter Partes* Review of U.S. Patent No. 7,082,640 (No. 2015-00468-Paper No. 1; December 19, 2014) |
| L. | Institution of *Inter Partes* Review of U.S. Patent No. 7,082,640 (No. 2015-00468-Paper No. 13; June 24, 2015) |
| M. | Final Written Decision for *Inter Partes* Review of U.S. Patent No. 7,082,640 (No. 2015-00468-Paper No. 24; June 17, 2016) |
| N. | Petition for *Inter Partes* Review of U.S. Patent No. 7,082,640 (No. 2015-00472-Paper No. 1; December 19, 2014) |
| O. | Institution of *Inter Partes* Review of U.S. Patent No. 7,082,640 (No. 2015-00472-Paper No. 12; June 24, 2015) |
| P. | Final Written Decision for *Inter Partes* Review of U.S. Patent No. 7,082,640 (No. 2015-00472-Paper No. 23; June 23, 2016) |

## NATURE OF THE ACTION

1.     This is a class action that seeks just compensation for the taking of inventors' and patent owners' recognized patent property rights by the United States of America (the "Defendant").   This taking was effectuated by the United States Patent and Trademark Office, hereinafter, "USPTO") and by the alleged authority of recently created post-grant proceedings of the Leahy-Smith America Invents Act ("AIA").   The USPTO's invalidation of the Plaintiff's and Class member's patent claims was a taking without just compensation in violation of the Fifth Amendment of the Constitution.   The compensation due here includes, but is not limited to, expected royalties and other payments related to use of the patents. This case additionally seeks damages for the Defendant's breach of contract by failing to maintain in force the subject patent claims for the terms prescribed in the patent grants for the relevant claims, including the recovery of attorney fees expended defending those same patents in post-grant proceedings, any investments made in the inventions underlying those patents, any expected royalties or payments related to the patents, and all fees paid to the Defendant for the issuance of those patents. In the alternative, the case seeks to recover fees that were paid by inventors and patent owners to the USPTO, such fees having been exacted from Plaintiff and Class members through the AIA—according to the Defendant, these patents were issued erroneously by the USPTO in the first instance and thus all fees should be returned to the Plaintiff and Class members.

2.      Having a patent issued in your favor in the United States is a birthright for many inventors and business owners in the United States.  The patent itself serves multiple purposes, including, among others, serving as (1) validation that the subject invention is worthy of protection in the United States, (2) a property right with the ability to exclude others from using the subject inventions, (3) and protection that allows an inventor and patent owner to invest in the subject inventions with knowledge that the investment is protected from use by others, which is a stated policy underlying the grant of a patent.  Once a patent is issued by the USPTO, it is presumed valid by statute.  See 35 U.S. Code § 282.

3.      The process for obtaining a patent can be an arduous and expensive one. An overview of the patent process is included on the USPTO website.  See https://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applicatio ns/utility-patent/patent-process-0 (last accessed April 5, 2018).  In short, the applicant for a patent must first see if their invention has already been patented before determining to file, decide whether to file nationally and/or internationally, decide whether to file themselves or through an attorney, apply for the patent using a patent application, pay the application fees, and then interact with the examiners that are looking at the application to determine whether the inventions disclosed therein are patentable.  Id.

4.      After a patent application has been reviewed by the USPTO's examiners and any objections by the examiner are overcome, the examiner may find the claims

in the application patentable.  At that point, the USPTO sends a Notice of Allowance and Fee(s) due to the applicant and future patent owner.  An actual patent is issued only once those fees are paid by the applicant by the date they are due (by completing the Fee(s) Transmittal form, Part B), which comprises an acceptance of the offer to issue a patent (for a specific statutory time period subject to any Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)) as outlined in the patent application and office action history.  At that point an Issue Notification is issued, which includes a patent number and date of issuance.  To preserve the enforceability of the patent going forward, the patentee and/or patent owner must also pay the maintenance fees that are due (per the maintenance fee schedule for that patent).

5.      The patent is sent to the owner of the patent, and it includes a certificate issued and signed by the Director of the United States Patent and Trademark Office (the "Patent Certificate").   The certificate indicates that the Director of the USPTO

> has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.
>                                     . . .
>
> [The] United States Patent [g]rants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention . . . for the term set forth in 35 U.S.C. 154(a)(2) or (c)(1), subject to the payment of maintenance fees as provided by 35 U.S.C. 41(b).  See Maintenance Fee Notice on the inside of the cover.

This Patent Certificate memorializes the terms of contract between the Plaintiff and Class members, on the one hand, and the Defendant, on the other.

6.      This process of obtaining a patent has been substantially similar for decades.   However, in 2011, the AIA was enacted into law.   The changes were allegedly an attempt to harmonize U.S. patent law with other parts of the world, but it also included changes to the various post-grant proceedings available.  Specifically, it created a new type of proceeding called "Inter Partes Review" ("IPR"), which became available on September 16, 2012.    It also created something called Post-Grant Review (PGR) proceedings.[1] Under PGR, a person who is not the patent owner may petition the USPTO to review the validity of an issued patent within nine months of its grant or issuance of a reissue patent. PGR rules went into effect September 16, 2012.

7.      Together, these post-grant proceedings (hereafter, referred to as "PGP") created through the AIA have completely decimated the value of issued patents.  They have been so detrimental to inventors and patent holders that the tribunal that is the forum for these PGP proceedings, the Patent Trial and Appeal Board ("PTAB"), is often referred to as the "patent death squad." See, e.g., http://www.ipwatchdog.com/2014/03/24/ptab-death-squads-are-all-commercially-viable-patents-invalid/id=48642/ (last accessed April 5, 2018); https://www.bloomberg.com/news/articles/2017-11-27/patent-death-squad-pitting-tech-and-pharma-heads-to-high-court (last accessed April 5, 2018).   It is known as the Patent Death Squad for good reason.

---

[1] It also created Covered Business Method reviews, a form of PGR.

8.      As a point of reference, the IPR "procedure allows any entity to request that the US Patent Office initiate a review of a valid, issued US Patent. [As of January of 2015], 77% of all patent claims reviewed have been invalidated."[2]  More recently, it has been calculated that "[o]nly 4 percent of all PTAB petitions for review proceedings end with a final written decision in which all claims are upheld as patentable."   See   http://www.ipwatchdog.com/2017/06/14/90-percent-patents-challenged-ptab-defective/id=84343/ (last accessed April 2, 2018).  The costs of these post issuance proceedings to individual inventors and to the economy have been staggering.  Indeed, it has been estimated that the damage to the economy resulting from the creation of the IPR process alone is equal to around $1 trillion dollars.[3]

9.      **The most disturbing aspect of this, however, is the fact that those property rights <u>were</u> granted, and they were later Taken away, and this was done so without the just compensation that is required under law.**  The present situation has unfolded despite (1) the long-standing policy of encouraging investment-backed risk

---

[2]<u>See</u>  https://patentlyo.com/patent/2015/06/america-invents-trillion.html?utm_source =feedburner&utm_medium=email&utm_campaign=Feed%3A+PatentlyO+%28Denn is+Crouch%27s+Patently-O%29 (citing "US Patent and Trademark Office, 'Inter Partes Review Petitions Terminated to Date (as of 1/15/2015)', downloaded from http://www.uspto.gov/sites/default/files/documents/inter_partes_review_petitions_te rminated_to_date%2001%2015%202015.pdf on 6 May 2015.  In the proceeding where the USPTO decided the merits of the Inter Partes Review petitions, 643 claims were found patentable and 2176 claims were found unpatentable, or 77%.), (last accessed April 2, 2018)

[3] <u>See</u>, supra, fn. 2.

in patented technologies through the granting of patents and (2) the statutory presumption of validity given to all patents.

10.     Also at the center of this lawsuit is the public (and shocking) admission by the USPTO that PGPs are designed to invalidate patents that were erroneously granted in the first instance.  See e.g., Brief for the Federal Respondent in Opposition, at pp. 11-12, Oil States Energy Services, LLC v. Greene's Energy Group, LLC, Case No. 16-712 (April 28, 2017), attached as **Exhibit A**;[4] Brief for the Federal Respondent in Opposition, at pp. 10, 16, 51; Oil States Energy Services, LLC v. Greene's Energy Group, LLC, Case No. 16-712 (October 23, 2017), attached as **Exhibit B**.  In other words, the USPTO has publicly admitted it erred in issuing in the first place the patents and claims that it later invalidated in PGP proceedings like the IPR.   In fact,

---

[4] In that brief, the U.S. Government took the position that the "basic purpose[]" of _inter partes_ review is simply "to reexamine an earlier agency decision." Id. at 9 (citing Cuozzo Speed Techs., LLC v. Lee, 136 S. Ct. 2131, 2144 (2016)).  Indeed, it claimed that "'[f]or several decades' the USPTO has engaged in post-issuance review of patents to 'remedy defective governmental * * * action' and 'if need be to remove patents that should never have been granted." Id. at 11-12  (citing Cuozzo Speed Techs., LLC v. Lee, 136 S. Ct. at 2137; Patlex Corp. v. Mossinghoff, 758 F.2d 594, 604 (Fed. Cir.), modified on other grounds on reh'g, 771 F.2d 480 (Fed. Cir. 1985); see Joy Techs., Inc. v. Manbeck, 959 F.2d 226, 229 (Fed. Cir.), cert. denied, 506 U.S. 829 (1992)).  It also argued that "[n]umerous other statutes contain similar provisions that allow agencies to correct their own errors, including by recovering erroneous disbursements of money to private parties." Id. at 12 (citing 5 U.S.C. 8470 (authorizing the Executive Branch to recover overpayments of federal employee benefits); 38 U.S.C. 5302 (authorizing the Executive Branch to recover veterans' benefits overpayments); 42 U.S.C. 404 (authorizing the Executive Branch to recover Social Security overpayments)).

one of the first things that the Supreme Court acknowledged in the *Oil States* oral argument was this apparent fact:

> JUSTICE GINSBURG:   Ms. Ho, you outlined your position, but there must be some means by which the Patent Office can correct the errors that it's made, like missing prior art that would be preclusive.

See Transcript of Oral Argument in Oil States Energy Services, LLC v. Greene's Energy Group, LLC, Case No. 16-712, at 3:24-4:3, dated November 27, 2017 (available at   https://www.supremecourt.gov/oral_arguments/argument_transcripts/2017/16-712_879d.pdf) (last accessed April 10, 2018).   Indeed, according to several of the Justices, the IPR process is "geared to be an error correction mechanism and not a substitute for litigation."   Id., at 14:4-6; see also, id., at 21:23-22:5 (Justice Kagen stating that the IPR process is "the government trying to figure out whether it made a mistake by granting the patent, which the government sometimes does and knows it sometimes does . . . .").

11.     Naturally, if this is the case, then the USPTO should never have collected (or be allowed to keep) any issuance fees or maintenance fees for any of the patents and claims that have been invalidated in any PGP process, and the patent owners of these patents should never have had to defend these patents (which were rightfully and reasonably defended because each of them was presumed valid by statute) in the PGP proceeding, which often costs hundreds of thousands of dollars in attorney fees and expenses to defend.   But for the fact that the patents were issued (and a property right granted in the first place), the patent owners would not have

invested the time, resources, and money into the subject inventions and the monetization of those inventions, whether through product development or otherwise.

12.     Despite this public admission, and the direct implications thereof, the USPTO has (1) failed to compensate patent owners for the taking of their property rights without just compensation, including, but not limited to, expected royalties and other payments related to use of the patents, (2) failed to compensate patent owners for the attorney fees expended in defending these patents in PGP proceedings (patents that were presumed valid by statute), (3) not compensated patent owners for the investments they made into to the subject inventions that each of the patent owners thought were protected by the patents and patent claims, and (4) chosen to retain the fees it collected as a result of issuing those patents, which it is not entitled to keep if these patents were, as claimed by the Defendant, issued in error.

13.     Christy is the owner of United States Patent No. 7,082,640 that was subject to an PGP that resulted in its claims being invalidated and for which Plaintiff was never (1) compensated with value for the property that was taken, including, but not limited to, for expected royalties and other payments for use of the patent, (2) reimbursed for attorney fees spent in defending the PGP, (3) compensated for investments spent on the subject invention that were thought to be protected by the subject patent, or (4) refunded for fees paid.

14.     Class members each also own one or more patents that were subject to a PGP that resulted in its claims being invalidated and for which they were never (1) compensated with value for the property that was taken, (2) reimbursed for attorney fees spent in defending the PGP, (3) compensated for investments spent on the subject invention that were thought to be protected by the subject patent, or (4) refunded for fees paid.

## PARTIES

15.     Christy is a corporation organized under the laws of the State of Oklahoma with its principal place of business in Tulsa County.

16.     Defendant is the United States of America, acting through its various agencies, including but not limited to the USPTO, an agency of the Department of Commerce that is responsible for conducting examinations for eligibility and patentability of all patent applications that are filed in the United States. Defendant, the United States of America, is the proper party to be sued under 28 U.S.C. § 1491. The USPTO is an administrative agency of the Defendant and is responsible for conducting examinations for patentability of all patent applications that are filed in the United States and for issuing patents for those patent applications that are determined to qualify for patent protection. This includes the above-noted patents owned by the Plaintiff and by members of the proposed Class members.

17.     Members of the proposed Class are owners (or their assigns) of those patent applications which were deemed to include patentable subject matter and

which were issued into valid patents and claims and were later invalidated by the

Patent Trial and Appeal Board ("PTAB"), which is part of the office of the USPTO.

See 35 U.S. Code § 6

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action and venue is proper in this

Court pursuant to 28 U.S.C. § 1491(a)(1) (the "Tucker Act"), because this suit asserts

claims against the United States founded upon (1) express or implied contract claims

to which the United States is a party (2) Takings Clause of the Fifth Amendment,

and (3) a Violation of Due Process (exaction), and the remedy sought is money

damages only.    This Court has jurisdiction under the Tucker Act to hear the

aforementioned claims.

## CONSTITUTIONAL PROVISION

19.     Certain of Plaintiff's and the putative Class' claims are governed by the

Fifth Amendment to the United States Constitution, which provides in pertinent part

that no person shall "be deprived of life, liberty, or property, without due process of

law; nor shall private property be taken for public use, without just compensation,"

and which incorporates the protections of the Equal Protection Clause.

## CONTRACTS GIVING RISE TO JURISDICTION

20.     The remaining claims of Plaintiff and the Class members are brought

under and/or pursuant to the contracts (express or, alternatively, implied) that were

formed between and among Plaintiff and Class members, on the one hand, and the

United States and/or USPTO, on the other.  These contracts comprised the agreement by the government to issue a patent with specific claims (rights), a specific identification number, a specific date of issuance, and for a specific time period (subject to any Determination of Patent Term Adjustment under 35 U.S.C. 154 (b) included in the Notice of Allowance and Fee(s)) in exchange for payment of issuance fees (and further subject to an agreement to maintain the patent in force as long as payment of maintenance fees on the schedule set by the USPTO was made), which include at least certain terms in the Notice of Allowance and Fee(s) issued to the applicant and future patent owner that were accepted when the Issue Fee(s) were paid by Plaintiff and putative Class members by the date they were due (by completing the Fee(s) Transmittal form, Part B).  The Notice of Allowance and Fee(s) Transmittal form for Christy's patent is attached as **<u>Exhibit C</u>**, dated Mar. 2, 2006 and identical Notices of Allowance and Fee(s) Transmittal forms were issued to each of the Class members and were returned to the USPTO with the payment of the subject fees in order to be issued a patent.  Each of them forms an express contract, or in the alternative, an implied contract and/or implied-in-fact contract with the United States and/or USPTO.  By way of each of the contracts giving rise to jurisdiction here, to which the Defendant is a party, the Defendant waived its sovereign immunity with respect to the contracts and subject of the contracts.

## BACKGROUND INFORMATION

21.    The recognition of patent rights is effectuated through federal law, codified at 35 U.S.C. § 1 *et seq.*   A patent is a property right, the authorization of which is derived from the U.S. Constitution: "Congress shall have power … to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."  U.S. Constitution, Article 1, Section 8, clause 8.

> A patent is issued by the United States Patent and Trademark Office. Generally, the term of a new patent is 20 years from the date on which the application for the patent was filed in the United States or, in special cases, from the date an earlier related application was filed, subject to the payment of maintenance fees. U.S. patent grants are effective only within the United States, U.S. territories, and U.S. possessions. Under certain circumstances, patent term extensions or adjustments may be available.

https://www.uspto.gov/patents-getting-started/general-information-concerning-patents#heading-1 (last accessed April 6, 2018).

22.    By statute, a patent constitutes a personal property right.  See 35 U.S.C. § 261 ("Subject to the provisions of this title, patents shall have the attributes of personal property.")

23.    The USPTO "is the federal agency for granting U.S. patents and registering trademarks. In doing this, the USPTO fulfills the mandate of Article I, Section 8, Clause 8 of the Constitution …."[5]

---

[5]    Source:    https://www.commerce.gov/doc/united-states-patent-and-trademark-office#4/37.71/-99.48 (last accessed April 6, 2018).

The role of the USPTO is to grant patents for the protection of inventions and to register trademarks. It serves the interests of inventors and businesses with respect to their inventions and corporate products, and service identifications. It also advises and assists the President of the United States, the Secretary of Commerce, the bureaus and offices of the Department of Commerce, and other agencies of the government in matters involving all domestic and global aspects of "intellectual property." Through the preservation, classification, and dissemination of patent information, the Office promotes the industrial and technological progress of the nation and strengthens the economy.

In discharging its patent related duties, the USPTO examines applications and grants patents on inventions when applicants are entitled to them; it publishes and disseminates patent information, records assignments of patents, maintains search files of U.S. and foreign patents, and maintains a search room for public use in examining issued patents and records. The Office supplies copies of patents and official records to the public. It provides training to practitioners as to requirements of the patent statutes and regulations, and it publishes the Manual of Patent Examining Procedure to elucidate these. Similar functions are performed relating to trademarks. By protecting intellectual endeavors and encouraging technological progress, the USPTO seeks to preserve the United States' technological edge, which is key to our current and future competitiveness. The USPTO also disseminates patent and trademark information that promotes an understanding of intellectual property protection and facilitates the development and sharing of new technologies worldwide.

https://www.uspto.gov/patents-getting-started/general-information-concerning-patents#heading-1 (last accessed April 6, 2018).

24.    The USPTO charges numerous fees associated with obtaining a patent.

See    https://www.uspto.gov/sites/default/files/documents/USPTO%20fee%20schedule_current.pdf (last accessed April 6, 2018) (USPTO Fee Schedule, incorporated herein by reference).  Those fees include, among others, issue fees and maintenance fees.  Id.  Specifically, and as of the latest publication date, some of those fees are as follows:

| Patent Post-Allowance Fees | | | | | |
|---|---|---|---|---|---|
| **Fee Code** | **37 CFR** | **Description** | **Fee** | **Small Entity Fee** | **Micro Entity Fee** |
| 1501/2501/3501 | 1.18(a)(1) | Utility issue fee | 1,000.00 | 500.00 | 250.00 |
| 1511/2511/3511 | 1.18(a)(1) | Reissue issue fee | 1,000.00 | 500.00 | 250.00 |
| 1502/2502/3502 | 1.18(b)(1) | Design issue fee | 700.00 | 350.00 | 175.00 |
| 1503/2503/3503 | 1.18(c)(1) | Plant issue fee | 800.00 | 400.00 | 200.00 |
| n/a | 1.18(d)(1) | Publication fee for early, voluntary, or normal publication | 0.00 | 0.00 | 0.00 |
| 1505/2505/3505 | 1.18(d)(3) | Publication fee for republication | 300.00 | 300.00 | 300.00* |
| * Third-party filers are not eligible for the micro entity fee. | | | | | |

| Patent Maintenance Fees | | | | | |
|---|---|---|---|---|---|
| **Fee Code** | **37 CFR** | **Description** | **Fee** | **Small Entity Fee** | **Micro Entity Fee** |
| 1551/2551/3551 | 1.20(e) | For maintaining an original or any reissue patent, due at 3.5 years | 1,600.00 | 800.00 | 400.00 |
| 1552/2552/3552 | 1.20(f) | For maintaining an original or any reissue patent, due at 7.5 years | 3,600.00 | 1,800.00 | 900.00 |
| 1553/2553/3553 | 1.20(g) | For maintaining an original or any reissue patent, due at 11.5 years | 7,400.00 | 3,700.00 | 1,850.00 |
| 1554/2554/3554 | 1.20(h) | Surcharge - 3.5 year - Late payment within 6 months | 160.00 | 80.00 | 40.00 |
| 1555/2555/3555 | 1.20(h) | Surcharge - 7.5 year - Late payment within 6 months | 160.00 | 80.00 | 40.00 |
| 1556/2556/3556 | 1.20(h) | Surcharge - 11.5 year - Late payment within 6 months | 160.00 | 80.00 | 40.00 |
| 1558/2558/3558 | 1.17(m) | Petition for the delayed payment of the fee for maintaining a patent in force | 2,000.00 | 1,000.00 | 500.00 |

The exact fees that pertain to Plaintiff and Class members vary depending on the date of the notices of allowance and dates of issuance, but in any event, those fees were set and collected by the USPTO at the relevant time periods.

25.     The payment of issuance fees is a condition precedent to the USPTO recognizing patent rights.  See Patent Act of 1790, 1 Stat. 109, Ch, VII, Sec. 7; 35 U.S.C. § 154; see also Figueroa v. U.S., 466 F.3d 1023, 1026, 1031 (Fed. Cir. 2006). Payment of the "issuance fee" is required under 35 U.S.C. § 41(a)(4).  Failure to pay the "issuance fee" will lead to the application being treated as abandoned, unless the

Director otherwise accepts the fee. <u>See</u> 35 U.S.C. §§ 111(a)(3), 151(b); 37 C.F.R. 1.311

see <u>also</u> <u>Figueroa</u>, 466 F.3d at 1027.

    26.    Plaintiff and Class members each paid their issuance fees to the USPTO

as they were required to do under the contract between them and the USPTO.

<u>**The Nature and Purpose of Patents**</u>

    27.    A patent is a property right, and it includes the "right to exclude others"

which is "one of the most essential sticks in the bundle of rights that are commonly

characterized as property." <u>Kaiser Aetna v. United States</u>, 444 U.S. 164, 176, 62 L.

Ed. 2d 332, 100 S. Ct. 383 (1979).

> The patent is issued in the name of the United States under the seal
> of the United States Patent and Trademark Office, and is either
> signed by the Director of the USPTO or is electronically written
> thereon and attested by an Office official. The patent contains a grant
> to the patentee, and a printed copy of the specification and drawing
> is annexed to the patent and forms a part of it. The grant confers "the
> right to exclude others from making, using, offering for sale, or
> selling the invention throughout the United States or importing the
> invention into the United States" and its territories and possessions
> for which the term of the patent shall be generally 20 years from the
> date on which the application for the patent was filed in the United
> States or, if the application contains a specific reference to an earlier
> filed application under 35 U.S.C. 120, 121 or 365(c), from the date of
> the earliest such application was filed, and subject to the payment of
> maintenance fees as provided by law.

https://www.uspto.gov/patents-getting-started/general-information-concerning-
patents#heading-24 (last accessed April 6, 2018).

    28.    Without the right to exclude, "the express purpose of the Constitution

and Congress, to promote the progress of the useful arts, would be seriously

undermined." This right is implemented by the licensing and exploitation of patents Smith International, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1577-78, (Fed. Cir. 1983), cert. denied, 464 U.S. 996, 104 S. Ct. 493, 78 L. Ed. 2d 687 (1983).

29.     "The encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude." Patlex Corp. v. Mossinghoff, 758 F.2d 594, 599-600 (Fed. Cir. 1985). This issue of investment and reliance on granted patents was also raised in oral argument in Oil States.

> JUSTICE BREYER:    You at some point --I mean, what I've wondered as I've read this is suppose that just what you say happens, that all we're doing is reexamining the patent and the statute provides it, but suppose that the patent has been in existence without anybody reexamining it for 10 years and, moreover, the company's invested $40 billion in developing it. And then suddenly somebody comes in and says: Oh, oh, we -- we want it reexamined, not in court but by the Patent Office. Now, that seems perhaps that it would be a problem or not?

See Transcript of Oral Argument in Oil States Energy Services, LLC v. Greene's Energy Group, LLC, Case No. 16-712, at 29:6-18, dated November 27, 2017 (available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2017/16-712_879d.pdf); see also id. at 54:2-5 (Chief Justice Roberts stating "people invest in their patents to the tunes of billions of dollars in building the plant that's going to make the product . . . .").

30.     Each patent so issued and invested in was subject to a statutory presumption of validity. 35 U.S.C. § 282. Plaintiff and Class members reasonably relied on this presumption (and policy of encouraging investment based risk) in

making substantial investments into the underlying technologies, including the time, resources, and money investments into the subject inventions and the monetization of those inventions by products development and otherwise.

## The Genesis Of "Maintenance Fees."

31.     The concept of "maintenance fees" was introduced in 1980 (along with a host of other fees); it was introduced with a set of laws creating a "reexamination" procedure, defining government rights to intellectual property arising from federally funded research, and providing for the use of fees to fund the USPTO.  See Pub. L. No. 96-517 (1980); see also Figueroa, 466 F.3d at 1026.  A maintenance fee is a required payment of a sum certain that must be paid on a schedule to keep the patent in force.

32.     In order to maintain the life of an issued patent for its full term after it has issued, a "maintenance fee" must be paid, by the latest, at 4 years, 8 years and 12 years after issuance of the patent.  Failure to pay "maintenance fees" will lead to the expiration/abandonment of the patent.  See 35 U.S.C. § 41(b), see also Figueroa, 466 F.3d at 1027.

33.     With the institution of "maintenance fees," Congress sought to increase revenue to more fully pay for the costs of administering patents while spreading the issuance fee out over four installments to ameliorate the increase in cost to inventors. See 126 Cong. Rec. H10762-73 (daily ed. Nov. 17, 1980).  As a result,

All utility patents that issue from applications filed on or after December 12, 1980 are subject to the payment of maintenance fees which must be paid to maintain the patent in force. These fees are due at 3.5, 7.5 and 11.5 years from the date the patent is granted and can be paid without a surcharge during the "window period," which is the six-month period preceding each due date, e.g., three years to three years and six months. (See fee schedule for a list of maintenance fees.) In submitting maintenance fees and any necessary surcharges, identification of the patents for which maintenance fees are being paid must include the patent number, and the application number of the U.S. application for the patent on which the maintenance fee is being paid. If the payment includes identification of only the patent number, the Office may apply payment to the patent identified by patent number in the payment or the Office may return the payment. (See 37, Code of Federal Regulations, section 1.366(c).)

Failure to pay the current maintenance fee on time may result in expiration of the patent. A six-month grace period is provided when the maintenance fee may be paid with a surcharge. The grace period is the six-month period immediately following the due date. The USPTO does not mail notices to patent owners that maintenance fees are due. If, however, the maintenance fee is not paid on time, efforts are made to remind the responsible party that the maintenance fee may be paid during the grace period with a surcharge. If the maintenance fee is not paid on time and the maintenance fee and surcharge are not paid during the grace period, the patent expires on the date the grace period ends.

https://www.uspto.gov/patents-getting-started/general-information-concerning-patents#heading-25 (last accessed April 6, 2018).

34.     Plaintiff and Class members did pay their required maintenance fees pursuant to their obligation under the contract between them and the USPTO.

## The Patent Trial and Appeal Board

35.     The USPTO's procedures for conducting a PGP, including IPRs, CBMs, and PGRs, are governed by 37 C.F.R. § 42.

36.     In creating these procedures, Congress declared that "[t]here shall be in the [USPTO] a Patent Trial and Appeal Board. The Director, the Deputy Director, the Commissioner for Patents, the Commissioner for Trademarks, and the administrative patent judges shall constitute the Patent Trial and Appeal Board.  The administrative patent judges shall be persons of competent legal knowledge and scientific ability who are appointed by the Secretary, in consultation with the Director."  See 35 U.S.C. § 6.

37.     "The Patent Trial and Appeal Board (PTAB) conducts trials, including inter partes, post-grant, and covered business method patent reviews and derivation proceedings; hears appeals from adverse examiner decisions in patent applications and reexamination proceedings; and renders decisions in interferences."   See https://www.uspto.gov/patents-application-process/patenttrialandappealboard   (last accessed April 12, 2018).

## Post Issuance Proceedings – IPRs, PGRs, and CBMs.

38.     The most recent PGPs were promulgated into existence with the passage in 2011 of the Leahy-Smith America Invents Act (Pub. L. No. 112-29, 125 Stat. 284 (2011); hereinafter, the "AIA"), which was codified at 35 U.S.C. §§ 311–319.

39.     The purpose of an IPR is "to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). The purpose of a PGR is "to cancel as unpatentable 1 or more claims of a patent on any ground that could be raised under paragraph (2) or (3) of section 282(b) (relating to invalidity of the patent or any claim)."  35 U.S.C. § 321(b)

40.     Any person other than the patent owner may petition the USPTO to institute a PGP.  <u>See</u> 35 U.S.C. § 311(a), 321(a).

41.     The Director of the USPTO is responsible for promulgating regulations to govern the PGP processes.  <u>See</u> 35 U.S.C. § 316(a)(4), 326(a)(4).

42.     The PTAB, an administrative law body within the USPTO and created by the AIA, is responsible for conducting PGPs.  <u>See</u> 35 U.S.C. § 316(c), 326(c).

43.     "Section 10 of the AIA authorizes the Director of the USPTO to set or adjust by rule all patent and trademark fees established, authorized, or charged under Title 35 of the U.S. Code and the Trademark Act of 1946 (15 U.S.C. § 1051 et seq.), respectively. When fees are set, the aggregate revenue from the patent fees may only recover the aggregate estimated cost of the patent operations, including administrative costs to the USPTO."[6]

---

[6]  Source:  https://www.uspto.gov/patent/laws-and-regulations/america-invents-act-aia/fees-and-budgetary-issues (last visited: February 15, 2018)

44.     The apparent (or stated) purpose of PGPs, like IPRs, is to correct mistakes in the USPTO's process for issuing a "defectively examined and therefore erroneously granted patent." See Patlex Corp., 758 F.2d at 604.

45.     Indeed, the USPTO has even recently argued to the Supreme Court— and the Supreme Court accepted—that an IPR serves to correct mistakes made that resulted in the issuance of a patent in error. See, supra, paras. 9 and 11.

46.     The process and timeline of an IPR is generally as follows:

- The first step to commence an IPR, PGR or CBM is for petitioner to file a petition identifying challenged claims. See 37 C.F.R. § 42.15(a) and (b). The petitioner must pay ***all fees at the time of filing*** which include;

  o IPR – request fee is $9,000 plus $200 (for each claim over 20); post-institution fee is $14,000 (basic fee) plus $400 (for each claim over 15);

  o PGR/CBM – request fee is $12,000 plus $250 (for each claim over 20); post-institution fee is $18,000 (basic fee) plus $550 (for each claim over 15);

  ***If the PTAB either does not institute or only institutes in part, the petitioner is entitled to a full or partial refund of the post-institution fee, respectively.  The request fee is non-refundable.***

- The patent owner may elect to file a preliminary response to an IPR, PGR or CBM petition within three months of the PTAB's notice.  See 37 C.F.R. §§ 42.107(b) and 42.207(b));

- The PTAB will then institute the proceeding on challenged claims where the petitioner has satisfied the threshold standard for instituting trial, which is as follows depending on the type of PGP;

  o IPR – Petitioner must show that there is a reasonable likelihood that it will prevail on at least one of the challenged claims.  See 35 U.S.C. §314(a));

       o  PGR – Petitioner must show that it is more likely than not (greater than 50%) that at least one of the challenged claims is unpatentable. <u>See</u> 35 U.S.C. §324(a));

        ·  CBM – As a form of PGR, the petition must meet same standard as PGR (see AIA § 18), and the patent must claim coverage of a financial product or service and not a technological invention (37 C.F.R. § 42.301);

- The PTAB will then issue a final written decision within one year of institution if no other event stopping the PGP happened in the interim.

47.    The statistics regarding IPRs, etc., make it very clear that the USPTO has apparently made many such "mistakes." <u>See</u> <u>e.g.</u>, Trial Statistics IPR, PGR, CBM, Patent Trial and Appeal Board February 2018, available at https://www.uspto.gov/sites/default/files/documents/trial_statistics_20180228.pdf, at p. 11 (last accessed April 12, 2018) (showing that, out of 8,210 petitions filed, only 2,000 have been denied, and 4,256 have been instituted, as of February 28, 2018).

48.    Out of the 4,256 petitions that were instituted, 1,304 had all claims upon which the petition was instituted cancelled as unpatentable and 323 had some claims cancelled as unpatentable. <u>See</u> Trial Statistics IPR, PGR, CBM, Patent Trial and Appeal Board February 2018, available at https://www.uspto.gov/sites/default/files/documents/trial_statistics_20180228.pdf, at p. 11 (last accessed April 12, 2018).

49.    The damage done to individual patents, even if only one claim of a patent is invalidated, is often insurmountable. The cancellation of even one claim devalues a patent and makes it more difficult to enforce. Even the institution of an IPR

proceeding with respect to a claim casts a long shadow on the validity of its other claims, and consequently, the patent's value, if there is a settlement or any other result other than complete vindication for those claims in a trial.   Accordingly, it is apparent that there are some fundamental problems with the USPTO's examination procedures.   Indeed, it has been estimated that those problems have damaged the entire U.S. economy to the tune of over a trillion dollars.   See, supra, para. 8 and fn.2.

50.   On the other hand, this process, which has created so many problems for inventors, companies, and the economy, is a boon to the USPTO.   Undeniably, the PTAB is a money printing machine for the USPTO.   As is easily discernable from the statistics and fees required above, the PTAB appears to have been paid almost $140 million dollars associated with PGPs just to fix its own "errors."[7]   That is correct— not only was the USPTO paid an unknown (but no doubt extremely high) amount of money on the front end to issue and maintain patents in "error," it was also paid at least another $140 million dollars on the back end to fix its own mistakes.

---

[7] Using the statistics on the PTAB website and the published filing fees the USPTO charges, it appears that $75,801,000 in filing fees were collected (using the total filed request numbers and the breakdown of IPR/PGR/CBM of 92%/7%/1%) and $60,945,920 in fees were kept due to institution of those PGPs (based on assumption that same percentage breakdown of IPR/PGR/CBM applies to institution, and without factoring in those that were partially refunded or where extra fees charged for claims above 15, which for estimation purposes, will be assumed to have cancelled each other out).   See e.g., Trial Statistics IPR, PGR, CBM, Patent Trial and Appeal Board February 2018, available at https://www.uspto.gov/sites/default/files/documents/trial_statistics_20180228.pdf, at p. 3 (last accessed April 12, 2018) (showing that, out of the total 8,210 PGP petitions, 7,573 were IPRs, 539 were CBMs, and 98 were PGRs, as of February 28, 2018).

51.     To make matters worse, while PGP petitioners can be reimbursed for certain fees paid by a petitioner if institution is denied or partially denied on their petition, a patent owner is not reimbursed for any of the issuance or maintenance fees if a patent and/or claim of theirs is invalidated.

52.     Recently, the Constitutional basis for IPRs was questioned.  <u>See</u> <u>Oil States Energy Services, LLC v. Greene's Energy Group, LLC</u>, Supreme Court Appeal 16-712 (argued November 27, 2017); <u>see also</u> <u>Cascades Projection LLC v. Epson Am., Inc.</u>, Fed. Cir. Appeal Nos. 2017-1517, 2017-1518 (argued March 9, 2018). Specifically, the petitioners in that case raised with the Supreme Court the question of whether inter partes review comports with Article III and the Seventh Amendment, which also subsumes the question of whether patents are a private or public property right.

53.     The Supreme Court recently issued its opinion in <u>Oil States</u>, and it held that, among other things, (1) the IPR process is constitutional (not violative of Article III or the Seventh Amendment), (2) that patent rights are public property rights (analogous to a franchise right to build railroads or bridges).  <u>Oil States v Greene's Energy</u>, 584 U.S. ___ (2018).   In doing so, the Supreme Court emphasized that the holding was very narrow:

> We address the constitutionality of inter partes review only . . . . Moreover, we address only the precise constitutional challenges that Oil States raised here. Oil States does not challenge the retroactive application of inter parties review, even though that procedure was not in place when its patent issued.  Nor has Oil States raised a due process challenge.  Finally, ***our decision should not be***

*misconstrued as suggesting that patents are not property for the purpose of the Due Process Clause or the Takings Clause.*

Id. at 16-17 (emphasis added).  It also cites to precedent with holdings consistent with this last sentence.  Id. (citing Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 527 U. S. 627, 642 (1999); James v. Campbell, 104 U. S. 356, 358 (1882)).

### Christy Obtains Patent No. 7,082,640 (hereinafter, the "'640 Patent").

54.    The '640 Patent resulted from application number 10/623,356 that was filed on July 18, 2003 and identified David L. McCutchen as the inventor.  See **Exhibit D** ('640 Patent), at p. 1.

55.    On or about March 2, 2006, the USPTO informed the applicant that application 10/623,356 had been "examined and is allowed for issuance as a patent."  See **Ex. C**, at p. 1 (hereinafter, "Christy's Notice of Allowance").

56.    Christy's Notice of Allowance indicated that an "issue fee" and a "publication fee" were due by June 2, 2006, and that the application would be considered abandoned if the fees were not paid.  See id.

57.    Christy's Notice of Allowance also indicated that "prosecution on the merits" of the application was complete and that 20 claims were allowed.  See id. at p.4.

58.    On or about May 31, 2006, Christy caused the issuance fee due to be paid.  See **Exhibit E** (May 31, 2006 Notice of Payment}.

59.    The '640 Patent was issued on August 1, 2006.  See **Exhibit D** ('640 Patent).  A certificate, including the language referenced and quoted in Paragraph 5, including the signature of the Director of the USPTO, accompanied this Patent.

60.    During prosecution, the inventor assigned ownership of the '640 Patent to Christy.  See **Exhibit F** (Christy Notice of Assignment).

61.    Christy caused the Maintenance Fee of $490 for the "3.5 Year Window" to be paid on or about October 29, 2009.  See **Exhibit G** (Christy 3.5 year payment).

62.    Christy caused the Maintenance Fee of $1800 for the "7.5 Year Window" to be paid on or about January 24, 2014.  See **Exhibit H** (Christy 7.5 year Payment).

63.    Christy caused the Maintenance Fee of $3700 for the "11.5 Year Window" to be paid on or about January 4, 2018.  See **Exhibit I** (Christy 11.5 year Payment).

64.    Christy has paid all Maintenance Fees owed.  See **Exhibit J** (Christy Payment Status).

65.    As with Christy, each of the Class members received a Notice of Allowance and Fee(s), completed the Fee(s) Transmittal form, Part B, and payed any fees, and receiving an Issue Notification. They also paid the maintenance fees as required by law to keep the patents in force.

66.    Christy, Inc. entered into at least one royalty agreement pertaining to the '640 Patent, and it earned royalty payments under that agreement in exchange for the right to use the technologies underlying the '640 Patent.

### Christy Loses Its Patent Claims Through The IPR Process.

67.     On or about December 19, 2014, an IPR challenge to claims 1-18 of the '640 Patent was lodged under Petition Number 2015-00468 ("IPR 2015-00468"). <u>See</u> **Exhibit K** (2015-00468 Petition).

68.     On or about June 24, 2015, the PTAB instituted IPR 2015-00468 for all claims challenged. <u>See</u> **Exhibit L** (2015-00468 Institution Decision).

69.     On or about June 17, 2016, the PTAB issued its Final Written Decision for 2015-00468. <u>See</u> **Exhibit M** (2015-00468 Final Written Decision).

70.     In its Final Written Decision for 2015-00468, the PTAB rendered all challenged claims of the '640 Patent invalid. <u>Id</u>. at pp. 29-30.

71.     On or about December 19, 2014, an IPR challenge to claims 1, 4-10, and 13-18 of the '640 Patent was lodged under Petition Number 2015-00472 ("IPR 2015-00472"). <u>See</u> **Exhibit N** (IPR 2015-00472 Petition).

72.     On or about June 24, 2015, the PTAB instituted IPR 2015-00472 for all claims challenged. <u>See</u> **Exhibit O** (IPR 2015-00472 Institution Decision).

73.     On or about June 23, 2016, the PTAB issued its Final Written Decision for IPR 2015-00472 . <u>See</u> **Exhibit P** (IPR 2015-00472 Final Written Decision).

74.     In its Final Written Decision for 2015-00472, the PTAB rendered all challenged claims of the '640 Patent invalid. <u>Id</u>. at p. 27.

75.     Christy has no recognized property rights remaining in the invention embodied in the claims of the '640 Patent that were invalidated.

76.     As with Christy, each of the Class members had at least one claim of at least one of their patents challenged in a PGP process, had that PGP instituted, and had at least one claim invalidated in a final written decision.

### The USPTO's Failure to Compensate

77.     The Defendant has not given Plaintiff or Class members any compensation, never mind just compensation, for taking their property.   It has not compensated Plaintiff or Class members for the attorney fees spent in defending the PGP or for any monies invested in the technologies underlying the invalidated claims. Nor has Defendant refunded the issuance and maintenance fees paid by Plaintiff or Class members.

### CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action on its own behalf and, pursuant to Rule 23 of the Rules of the United States Court of Federal Claims (hereinafter "Rule 23"), on behalf of the following nationwide class(es):

> All persons or entities that are owners of at least one patent of which one or more claims were invalidated in a PGP process and who paid their required issuance and maintenance fees up until such invalidation (the "Class").

79.     Excluded from each Class described above are those who have been proven to have engaged in inequitable conduct before the USPTO, Defendant, any directors, officers, political appointees, and affiliates thereof.

80.     The requirements of Rule 23(a) are satisfied.

81.     The Class members are so numerous that joinder of all Members is impracticable. The Class members are geographically dispersed and number in the thousands for each Class.  Disposition of the claims of the proposed Class in a class action will provide substantial benefits to both the parties and the Court.

82.     The rights of each Class Member were violated in a similar fashion based upon Defendant's uniform wrongful actions and/or inaction.

83.     The following questions of law and fact are common to each proposed Class Member and predominate over questions that may affect individual Class members, and include, among others:

a)      Whether the Defendant had any legal basis to appropriate Class members' patent property;

b)      Whether Defendant violated the Fifth Amendment in taking Class members' patent property;

c)      Whether the Defendant took Class members' property without just compensation in violation of the United States Constitution;

d)      Whether Class members are due just compensation for Defendant's taking of their property;

e)      Whether Defendant breached its contract with Class members respecting its issuance of the respective patents to each of them;

f)      Whether Class members were damaged by the Defendant's breach of contract;

g)      Whether the Defendant illegally exacted Class members' issuance and maintenance fees and investments in the patented technologies;

h)      Whether Defendant was unjustly enriched by keeping fees paid to it for patents that were later invalidated due to USPTO "error"; and

i)      Whether Defendant owes money damages to Class members.

84.     Plaintiff is a member of the Class

85.     Plaintiff's claims are typical of the claim of absent Class members. If brought individually, the claim of each Class Member would necessarily require proof of the same material and substantive facts, and seek the same remedies.   The Defendant's actions alleged herein have impacted Class members equally because such actions have been directed at the at the original patent examination process and the PGP processes, and the Class members were participants in both.   Accordingly, Plaintiff's claims against the Defendant based on the conduct alleged herein would be identical to the claims of other Class members.

86.     Further, and in the alternative, Fed. R. Civ. Proc. 23(c)(4) permits an action to be maintained as a class action with respect to only particular issues, and the common questions of law and fact set forth above raise issues which are appropriate for class treatment pursuant to Fed. R. Civ. Proc. 23(c)(4).

87.     Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the interest of the Class and have no interests adverse to, or which directly and

irrevocably conflicts with, the interests of other Class members. Further, Plaintiff is committed to prosecuting this action to a final resolution and, in furtherance thereof, Plaintiff has retained counsel experienced in prosecuting complex class action litigation.

88.     Defendant has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate equitable relief as it pertains to money damages with respect to the Class.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual claims by the Class members are impractical, as the costs of prosecution would exceed what any Class Member has at stake.

90.     Members of the Class are readily ascertainable through Defendant's records.

91.     Prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incomparable standards of conduct for Defendant. Moreover, adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members.

92.     Proposed class counsel are experienced in complex, class action litigation, have no conflicts of interest, and will zealously pursue the interests of the Proposed Class members herein.

93.    Plaintiff seeks class certification under Rule 23(b)(3) because as described above, common questions of fact and law predominate over any individual issues and a class action is superior to other methods of adjudicating the controversy.

## COUNT I: TAKING OF PROPERTY WITHOUT JUST COMPENSATION

94.    Plaintiff re-alleges and incorporates by reference each of the Paragraphs above.

95.    Plaintiff brings this claim on behalf of itself and all members of the Class.

96.    The Government is prohibited from taking "property . . . for public use, without just compensation." U.S. Const. Amend. V.

97.    The issuance of a patent to Plaintiff and Class members recognized a property right in each of the inventions embodied in the relevant claims, and those property rights were presumed valid, and when issued those property rights vested in Plaintiff and Class members.  See, e.g., Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 527 U. S. 627, 642 (1999) (patents as property right); James v. Campbell, 104 U. S. 356, 358 (1882) (same). Plaintiff and Class members also had property rights in the issue fees and maintenance fees paid, investments in the underlying technologies to the invalidated claims, and to the monies spent in defending the PGPs by Plaintiff and Class members.

98.    The Patent Certificate and patent itself memorializes the patent rights granted by Defendant to Plaintiff and Class members.

99.     Plaintiff's and Class members' patent granted them the right to dispose of, transfer, or exclude others from the use of the invention.  See Adams v. United States, 391 F.3d 1212, 1224 (Fed. Cir. 2004) (Under the Takings Clause, "property" is defined as a "legally-recognized property interest such as one in real estate, personal property, or intellectual property."); Florida Prepaid Postsecondary, 527 U.S. at 642; James, 104 U.S. at 358.  Each of them had this valid property interest at the time of the taking alleged herein.

100.    With the invalidation of the claims of the Plaintiff's and Class members' patents through a PGP process, each of their property rights in the invalidated claims, along with the issuance and maintenance fees and the investments made in the patented technologies, were taken by the Defendant (through the actions of the USPTO and PTAB) for public use.  By definition, the inventions covered by a claim become available for public use at the end of their patent term, but the Defendant's actions in the PGP process put those inventions into public use/the public domain upon invalidation of those claims.  Plaintiff and Class members were deprived of the value of the patented technologies, which includes expected royalties and other payments related to use of the patents, their investments in the patented technologies, the issuance and maintenance fees, and the attorney fees spent in defending the PGP processes that invalidated the claims.  These actions by the Defendant constitute a taking and constitute a violation of the Fifth Amendment, and compensation for that taking is due.

101.   The taking was the predictable result of the Defendant's (and USPTO) actions because it was the direct and necessary result of the invalidation of their respective patent claims and was, in any event, within contemplation of or reasonably to be anticipated by the Defendant.

102.   The Defendant's actions were a physical invasion of the Plaintiff's and Class members' property rights, or at a minimum were equal and akin to, and are properly characterized as, a physical invasion, and said invasion disenfranchised them from their duly granted property rights.  The Defendant's failure to pay just compensation for the taking of Plaintiff's and Class members' patent claims, including, but not limited to, expected royalties and other payments related to use of the patents, has a significant adverse economic impact on Plaintiff and Class members.

103.   At the time of their substantial investments into the patented technologies, the Plaintiff and Class members had reasonable investment backed expectations in receiving compensation for their claims—each of these patents having been duly issued by the USPTO after substantial examination and being presumed valid—as supported by the policy of granting patents to encourage investment backed risks into technologies. Indeed, Plaintiff and Class members rightfully and reasonably expected royalties and other payments from those that used the patented technologies.  Plaintiff and Class members had reasonable investment-backed expectations in receiving a market rate of return on the capital they invested in their

patented technologies (such investment having been encouraged by Defendant and then put to the public's use), their payment of issuance and maintenance fees, and attorney fees spent in defending the invalidated claims.

104.   The economic impact upon the Plaintiff and Class members was concrete and severe because the entire value of the claims and the fees were destroyed as to each of the Plaintiff and Class members through the Defendant's provision of those properties to public use.

105.   The Defendant's interference with the property rights of Plaintiff and Class members was substantial, permanent, and total, and it is sufficient to rise to the level of a taking by giving away the property rights for public use.  Justice and fairness require that the economic injuries caused by the Defendant's action be compensated by the Defendant, rather than remain disproportionately concentrated on the Plaintiff and Class members.

106.   Defendant has not compensated Plaintiff and Class members for the taking of their properties.

107.   As a direct and proximate result of the foregoing taking by Defendant, Plaintiff and Class members were damaged in an amount to be determined at trial but that includes compensatory damages, consequential damages, pre- and post judgment interest, special damages, costs, fees (including attorney fees), and any other damages available under the law and awarded by the Court.  Plaintiff and Class members are entitled to recover damages from the Defendant equal to their issuance

and maintenance fees, their investments made in the patented technologies, the attorney fees spent in defending the PGP processes that invalidated the claims, and the value of the patent claims themselves (for the avoidance of doubt, this value includes expected royalties and other payments related to use of the patents), in an amount to be determined at trial.

## COUNT II: BREACH OF CONTRACT

108.   Plaintiff re-alleges and incorporates by reference each of the Paragraphs above.

109.   Plaintiff brings this claim on behalf of itself and all members of the Class.

110.   Upon concluding its review of Plaintiff's and Class members' patent applications, the USPTO issued an offer in the form of a Notice of Allowance and Fee(s) due to Plaintiff and Class members.

111.   Both the USPTO and Plaintiff, like other Class members, intended to contract.   This Notice of Allowance and Fee(s) constituted an intent to contract between USPTO and Plaintiff, which cites to the underlying application and delineates the metes and bounds of each claim to be issued.  That Notice also included the consideration to be paid, the parties, the length of time the patent was to be issued (statutory time period plus term extension), among others.   If the applicant paid the fees, then the USPTO would issue a patent with those claims upon receipt of said fees.  A duty existed under that contract for the Defendant to keep the patent claims

in force as long as the Plaintiff and Class members paid their issue and maintenance fees.  No ambiguity existed as to the terms of the contract.  Payment of the issuance fees by Plaintiff and Class members in exchange for a duly issued patent by the USPTO constituted consideration for the contract. The Patent Certificate memorializes the terms of contract between the Plaintiff and Class members and the Defendant.

112.   A duty existed under that contract for the Defendant to keep the patent claims in force as long as the Plaintiff and Class members paid their issue and maintenance fees.  No ambiguity existed as to the terms of the contract.

113.   The USPTO representative who entered into the contract on behalf of the United States had actual authority to contractually bind the government.  In the alternative, this actual authority was implied because the USTPO agent's authority to issue patents upon receipt of issuance fees is an integral part of their duties.

114.   An actual patent was issued once the fees were paid by the Plaintiff and Class members by the date they were due (by completing the Fee(s) Transmittal form, Part B), which comprised an acceptance of the offer to issue a patent (for a specific time period subject to any Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)) as outlined in the patent application and office action history.  The acceptance comprised, among other terms, an acceptance of the material term of a discrete number of claims that were to be part of the issued patent.

115.   After payment was received by the USPTO, an Issue Notification was issued to Plaintiff and Class members, which included a patent number and date of issuance.   The offer and acceptance, detailed above, constituted a valid, existing contract with all the necessary terms.

116.   To preserve the enforceability of the patents going forward, Plaintiff and Class members paid the maintenance fees that were due (per the maintenance fee schedule for each of those patents) for the patents to stay in force.   See 35 U.S.C. § 41(b).   Thus, Plaintiff and Class members performed their obligations under the contract.

117.   After instituting a petition for the relevant PGP, the PTAB determined that certain claims of the Plaintiff's and Class members' patents were invalid.

118.   The PTAB's decision to invalidate the relevant claims of the Plaintiff's and Class members' patents extinguished any property rights in the inventions embodied in those claims and devalued any other claim that was related to the invalidated claims but not the subject of the PGP.

119.   Defendant, through the PTAB's decision to invalidate the claims of Plaintiff and Class members prior to the end of the statutory term (plus any extension) materially breached the terms of the contract between the USPTO and Plaintiff and Class members.   According to the Defendant, the Plaintiff's and Class members' patents were issued in "error."

120. Plaintiff and Class members have performed fully each and all of the conditions, covenants, and obligations imposed on it under the terms of the contract.

121. It was foreseeable and reasonable that Plaintiff and Class members would spend attorney fees in defending the subject patent claims in the PGP processes given the statutory presumption of validity afforded them and the policy of encouraging investment in patented technologies, and thus the attorney fees so spent are consequential damages to the breach of the contracts. It was also foreseeable that Plaintiffs would enter into royalty (and/or other payment) agreements pursuant to the patents granted, and thus those royalty or other payments would also be consequential damages to the breaches.

122. As a direct and proximate result of the foregoing material breach by Defendant, Plaintiff and Class members did not receive the benefit of the bargain to which they were entitled and suffered the damages alleged and sought immediately below, including damages for the value of the patent claims themselves (for the avoidance of doubt, this value includes expected royalties and other payments related to use of the patents), the attorney fees spent in defending the PGP process that invalidated the claims, the issue and maintenance fees paid by Plaintiff and Class members, and the investments in the patented technologies that were encouraged by Defendant.

123. The Plaintiff and Class members were damaged in an amount to be determined at trial but that includes compensatory damages, consequential damages,

pre- and post-judgment interest, special damages, costs, fees (including attorney fees), and any other damages available under the law and awarded by the Court.

## COUNT III: BREACH OF IMPLIED IN-FACT CONTRACT
## (IN THE ALTERNATIVE TO COUNT II)

124.   Plaintiff re-alleges and incorporates by reference each of the Paragraphs above.

125.   Plaintiff brings this claim on behalf of itself and all members of the Class.

126.   Upon concluding its review of Plaintiff's and Class members' patent applications, the USPTO issued a Notice of Allowance and Fee(s) due to Plaintiff and Class members.

127.   Both the USPTO and Plaintiff, like other Class members, intended to contract, even if impliedly.  This Notice of Allowance and Fee(s) constituted an intent to contract between USPTO and Plaintiff, which cites to the underlying application and delineates the metes and bounds of each claim to be issued.  That Notice also included the consideration to be paid, the parties, the length of time the patent was to be issued (statutory time period plus term extension), among others.   If the applicant paid the fees, then the USPTO would issue a patent with those claims upon receipt of said fees.  A duty existed under that implied contract for the Defendant to keep the patent claims in force as long as the Plaintiff and Class members paid their issue and maintenance fees.  No ambiguity existed as to the terms of the implied contract.  Payment of the issuance fees by Plaintiff and Class members in exchange

for a duly issued patent by the USPTO constituted consideration for the contract. The Patent Certificate memorializes the terms of the implied contract between the Plaintiff and Class members and the Defendant.

128.   A duty existed under that contract to for the Defendant to keep the patent claims in force as long as the Plaintiff and Class members paid their issue and maintenance fees.  No ambiguity existed as to the terms of the implied contract.

129.   The USPTO representative who entered into the implied contract on behalf of the United States had actual authority to contractually bind the government.   In the alternative, this actual authority was implied because the USTPO agent's authority to issue patents upon receipt of issuance fees is an integral part of their duties.

130.   An actual patent was issued once the fees were paid by the Plaintiff and Class members by the date they were due (by completing the Fee(s) Transmittal form, Part B), which comprised an acceptance of the offer to issue a patent (for a specific time period subject to any Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)) as outlined in the patent application and office action history.  The acceptance comprised, among other terms, an acceptance of the material term of a discrete number of claims that were to be part of the issued patent.

131.   After payment was received by the USPTO, an Issue Notification was issued to Plaintiff and Class members, which included a patent number and date of

issuance.    The offer and acceptance, detailed above, constituted a valid implied contract with all the necessary terms.

132.    To preserve the enforceability of the patents going forward, Plaintiff and Class members paid the maintenance fees that were due (per the maintenance fee schedule for each of those patents) for the patents to stay in force.  See 35 U.S.C. § 41(b).    Thus, Plaintiff and Class members performed their obligations under the contract.

133.    After instituting a petition for the relevant PGP, the PTAB determined that certain claims of the Plaintiff's and Class members' patents were invalid.

134.    The PTAB's decision to invalidate the relevant claims of the Plaintiff's and Class members' patents extinguished any property rights in the inventions embodied in those claims and devalued any other claim that was related to the invalidated claims but not the subject of the PGP.

135.    Defendant, through the PTAB's decisions to invalidate the claims of Plaintiff and Class members prior to the end of the statutory term (plus any extension) materially breached the terms of the implied contract between the United States (through its agent. the USPTO) and Plaintiff and Class members.  Although Plaintiff and Class members were induced into believing they were being granted a patent with certain claims and for a certain period of time, they (apparently) were not granted a patent with certain claims for a certain period of time as the patents were apparently issued in "error."

136. Plaintiff and Class members have performed fully each and all of the conditions, covenants, and obligations imposed on it under the terms of the implied contract.

137. It was foreseeable and reasonable that Plaintiff and Class members would spend attorney fees in defending the subject patent claims in the PGP processes given the statutory presumption of validity afforded them and the policy of encouraging investment in patented technologies, and thus the attorney fees so spent are consequential damages to the breach of the implied contracts. It was also foreseeable that Plaintiffs would enter into royalty (and/or other payment) agreements pursuant to the patents granted, and thus those royalty or other payments would also be consequential damages to the breaches.

138. As a direct and proximate result of the foregoing material breach by Defendant, Plaintiff and Class members did not receive the benefit of the bargain to which they were entitled and suffered the damages alleged and sought immediately below, including damages for the value of the patent claims themselves (for the avoidance of doubt, this value includes expected royalties and other payments related to use of the patents), the attorney fees spent in defending the PGP process that invalidated the claims, the issue and maintenance fees paid by Plaintiff and Class members, and the investments in the patented technologies that were encouraged by Defendant.

139.    The Plaintiff and Class members were damaged in an amount to be determined at trial but that includes compensatory damages, consequential damages, pre- and post-judgment interest, special damages, costs, fees (including attorney fees), and any other damages available under the law and awarded by the Court.

## COUNT IV: BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

140.    Plaintiff re-alleges and incorporates by reference each of the Paragraphs above.

141.    Plaintiff brings this claim on behalf of itself and all members of the Class.

142.    Plaintiff and Class members had a contract (express or, alternatively, implied) as set forth in Counts II and III.

143.    Plaintiff and Class members reasonably anticipated that the Defendant would continue to maintain in force their patent claims.

144.    The Defendant acted in bad faith by invalidating the claims it issued in the first instance, while profiting off the process for that invalidation.

145.    The Defendant did not make a broad and general change in the law because it specifically targeted the PGP processes and the patents issued to Plaintiff and Class members.

146.    Neither Plaintiff nor Class members could have reasonably anticipated a change in the law (PGP processes) specifically targeting their patent claims

147.   The Defendant destroyed the patent properties owned by Plaintiff and Class members.

148.   By failing to maintain in force the Plaintiff's and Class members' patent claims, the Defendant breached the implied covenant of good faith and fair dealing inherent in the Defendant's contracts with Plaintiff and Class members and will continue to breach the implied covenant each time the technologies underlying the subject claims is used by the public.

149.   It was foreseeable and reasonable that Plaintiff and Class members would spend attorney fees in defending the subject patent claims in the PGP processes given the statutory presumption of validity afforded them and the policy of encouraging investment in patented technologies, and thus the attorney fees so spent are consequential damages to the breach of the duty of good faith and fair dealing.  It was also foreseeable that Plaintiffs would enter into royalty (and/or other payment) agreements pursuant to the patents granted, and thus those royalty or other payments would also be consequential damages to the breaches.

150.   As a direct and proximate result of the foregoing breaches by Defendant, Plaintiff and Class members were damaged, including damages for the value of the patent claims themselves (for the avoidance of doubt, this value includes expected royalties and other payments related to use of the patents), the attorney fees spent in defending the PGP process that invalidated the claims, the issue and maintenance fees paid by Plaintiff and Class members, and the investments in the patented

technologies that were encouraged by Defendant.  Plaintiff and Class members seek damages in an amount to be determined at trial but that includes compensatory damages, consequential damages, pre- and post-judgment interest, special damages, costs, fees (including attorney fees), and any other damages available under the law and awarded by the Court.

### COUNT V: UNJUST ENRICHMENT
### (IN THE ALTERNATIVE TO COUNTS II, III, and IV)

151.   Plaintiff re-alleges and incorporates by reference each of the Paragraphs above.

152.   Plaintiff brings this claim on behalf of itself and all members of the Class.

153.   Upon concluding its review of Plaintiff's and Class members' patent applications, the USPTO issued a Notice of Allowance and Fee(s) due to Plaintiff and Class members.

154.   Both the USPTO (on behalf of Defendant) and Plaintiff, like other Class members, intended to contract.  This Notice of Allowance and Fee(s) constituted an intent to contract between USPTO and Plaintiff, which cites to the underlying application and delineates the metes and bounds of each claim to be issued.  That Notice also included the consideration to be paid, the parties, the length of time the patent was to be issued (statutory time period plus term extension), among others.  If the applicant paid the fees, then the USPTO would issue a patent with those claims upon receipt of said fees.  A duty existed under that intended contract to for the

Defendant to keep the patent claims in force as long as the Plaintiff and Class members paid their issue and maintenance fees.  No ambiguity existed as to the terms of the intended contract.   Payment of the issuance fees by Plaintiff and Class members in exchange for a duly issued patent by the USPTO constituted consideration for the intended contract. The Patent Certificate memorializes the terms of the intended contract between the Plaintiff and Class members and the Defendant.

155.   A duty existed for the Defendant to keep the patent claims in force as long as the Plaintiff and Class members paid their issue and maintenance fees.  There was no ambiguity with respect to that.

156.   The USPTO representative who entered into the contract on behalf of the United States had actual authority to contractually bind the government.  In the alternative, this actual authority was implied because the USTPO agent's authority to issue patents upon receipt of issuance fees is an integral part of their duties.

157.   An actual patent was issued once the fees were paid by the Plaintiff and Class members by the date they were due (by completing the Fee(s) Transmittal form, Part B), which comprised an acceptance of the offer to issue a patent (for a specific time period subject to any Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)) as outlined in the patent application and office action history.  The acceptance comprised, among other terms, an acceptance of the material term of a discrete number of claims that were to be part of the issued patent.

158.    After payment was received by the USPTO, an Issue Notification was issued to Plaintiff and Class members, which included a patent number and date of issuance.   The offer and acceptance, detailed above, constituted a valid implied contract with all the necessary terms.

159.    To preserve the enforceability of the patents going forward, Plaintiff and Class members paid the maintenance fees that were due (per the maintenance fee schedule for each of those patents) for the patents to stay in force.   See 35 U.S.C. § 41(b).   Thus, Plaintiff and Class members performed their obligations under the contract.

160.    After instituting a petition for the relevant PGP, the PTAB determined that certain claims of the Plaintiff's and Class members' patents were invalid.

161.    The PTAB's decision to invalidate the relevant claims of the Plaintiff's and Class members' patents extinguished any property rights in the inventions embodied in those claims and devalued any other claim that was related to the invalidated claims but not the subject of the PGP.

162.    Defendant, through the PTAB's decision to invalidate the claims of Plaintiff and Class members prior to the end of the statutory term (plus any extension) materially breached the terms of the implied contract between the USPTO and Plaintiff and Class members.   Although Plaintiff and Class members were induced into believing that were being granted a patent with certain claims and for

a certain period of time, they (apparently) were not granted a patent with certain claims for a certain period of time as the patents were apparently issued in "error."

163.   Plaintiff and Class members have performed fully each and all of the conditions, covenants, and obligations imposed on it under the terms of the implied contract.

164.   As a direct and proximate result of the foregoing material breach by Defendant, Plaintiff and Class members did not receive the benefit of the bargain to which it was entitled, and the Defendant was enriched without justification and at the Plaintiff's and Class members' expense, including in the form of the value of the patent claims themselves (for the avoidance of doubt, this value includes expected royalties and other payments related to use of the patents), the fees charged by the Defendant (and collected from) third parties to file for the PGP processes leading to the invalidation of the subject claims, the issue and maintenance fees paid by Plaintiff and Class members, and the investments in the patented technologies that were encouraged by Defendant (and that subsequently vested with the public due to said invalidation).   The parties had a direct relationship, and it is against equity and good conscience to permit the Defendant to retain the benefits of the issuance and maintenance fees due to at least the fact that Defendant was the one that made the decision to both issue and take away the very same claims.

165.   The Plaintiff and Class members were damaged in an amount to be determined at trial but that includes compensatory damages, consequential damages,

pre- and post judgment interest, special damages, costs, fees (including attorney fees),

and any other damages available under the law and awarded by the Court.

## COUNT VI: EXACTION
## (IN THE ALTERNATIVE TO COUNT I)

166.    Plaintiff re-alleges and incorporates by reference each of the Paragraphs

above.

167.    Plaintiff brings this claim on behalf of itself and all members of the

Class.

168.    Plaintiff and Class members each paid their issuance fees and

maintenance fees to the Defendant as indicated above and pursuant to the statutes

identified above and invested monies into the technologies underlying the invalidated

claims.

169.    Defendant, through the PTAB's decision to invalidate the claims of

Plaintiff's and Class members' patents and neglecting to return the issuance fee,

maintenance fees, and investments paid by them has improperly exacted said fees

and the value of the claims themselves.

170.    The exaction of these maintenance and issuance fees, the investments,

and the value of the claims themselves were based upon a power conferred by the

Patent Act and the AIA.  The exaction related to the fees and value of the claims was

additionally based on the Takings Clause, as alleged in Count I (such allegations

incorporated here by reference).

171.    The statutes causing the exaction provides expressly and by necessary implication that the remedy for its violation entails a return of money unlawfully exacted, for example, by providing for the reimbursement of PGP fees if the particular PGP is not instituted (with respect to the AIA), staging out maintenance fees over three payments (with respect to the Patent Act), by provisioning for "just compensation" (with respect to the Takings Clause), and pursuant to 35 U.S.C. § 42, which grants the Director the power to refund, each of which is money mandating (either expressly or impliedly).  At the same time, each of those claims was presumed valid when granted and therefore their invalidation was done in contravention of the Patent Act and 35 U.S. Code § 282.   As noted above and elsewhere in this Complaint, each of these statutes can fairly be interpreted as mandating compensation for damages sustained because of the breach of the duties they impose.

172.    The Defendant's actions in invalidating the claims had direct and substantial impact on the Plaintiff and Class members because it destroyed the value of the claims that it paid the Defendant for in the first instance and took the issuance and maintenance fees from Plaintiff and Class members and then later took away the same claims issued and maintained pursuant to those very fees. Defendant's actions also exacted the value of investments made into the technology underlying the subject claims and the value of the right to exclude (that investment having been encouraged by Defendant), which was subsequently taken to the public's benefit.   Said actions also effectively exacted the attorney fees spent in defending the subject patent claims

in the PGP processes given the statutory presumption of validity afforded them and the policy of encouraging investment in patented technologies.

173. As a direct and proximate result of the foregoing exaction by Defendant, Plaintiff and Class members were damaged in an amount to be determined at trial but that includes compensatory damages, consequential damages, pre- and post-judgment interest, special damages, costs, fees (including attorney fees), and any other damages available under the law and awarded by the Court.

## PRAYER FOR RELIEF

174. Plaintiff respectfully requests the following relief:

A.     An order certifying the Class and appointing Plaintiff as the representative of the Class and appointing the law firm representing Plaintiff as counsel for the Class;

B.     entry of a judgment in favor of Plaintiff and all Class members and against Defendant on all of Plaintiff's claims;

C.     entry of a judgment that Defendant has (1) Taken Plaintiff's and Class members' property within the meaning of the Fifth Amendment to the United States Constitution, (2) breached its contracts with Plaintiff and other Class members, (3) breached its implied covenant of good faith and fair dealing to Plaintiff and Class members, and alternatively, (4) exacted Plaintiff's and Class members' monies paid for issue and

maintenance fees, investments made in the patented technologies, and the value of the claims themselves;

D.  entry of judgment awarding Plaintiff and all Class members their full and just compensation, in an amount to be proven at trial, for Defendant's unconstitutional taking of Plaintiff's and Class members' property, including but not limited to expected royalties and other payments related to use of the patents;

E.  entry of a judgment awarding Plaintiff and all Class members their full and reasonable damages, in an amount to be proven at trial, for Defendant's breach of contract;

F.  entry of a judgment awarding Plaintiff and all Class members their full and reasonable damages, in an amount to be proven at trial, for Defendant's violation of the implied covenant of good faith and fair dealing;

G.  entry of a judgment awarding Plaintiff and all Class members their full and reasonable damages, in an amount to be proven at trial, for Defendant's exaction;

H.  an accounting for damages suffered by Plaintiff and all Class members and judgment requiring Defendant to compensate Plaintiff and all Class members for such damages;

I.      an award of any pre-judgment and post-judgment interest, costs, fees,

expenses, and attorneys' fees to which Plaintiff may be entitled; and

J.      such other and further relief as the Court may deem just and proper.

175.   Plaintiff, on behalf of itself and the Class members, hereby asserts that

the amount claimed to be owed by Defendant is greater than $100 million.

Dated: <u>May 9, 2018</u>          Respectfully submitted,

                           */s/ Timothy C. Davis*

                           **HENINGER GARRISON DAVIS, LLC**
                           James F. McDonough, III (Bar # 117088, GA)*
                           Jonathan R. Miller (Bar # 507179, GA)*
                           Travis E. Lynch (Bar # 162373, GA)*
                           3621 Vinings Slope, Suite 4320
                           Atlanta, Georgia 30339
                           Telephone: (404) 996-0869, 0863, 0867
                           Facsimile: (205) 547-5502, 5506, 5515
                           Email: jmcdonough@hgdlawfirm.com
                           Email: jmiller@hgdlawfirm.com
                           Email: tlynch@hgdlawfirm.com

                           Timothy C. Davis (Bar # ASB-6834-D63T, AL)
                           W. Lewis Garrison, Jr. (Bar # ASB-3591-N74W, AL)*
                           Christopher B. Hood (Bar # ASB-2280-S35H, AL)*
                           Anna M. Carroll (Bar # ASB-3029-Y40N, AL)*
                           2224 1st Avenue North
                           Birmingham, Alabama 35203
                           Telephone: (205) 326-3336
                           Facsimile: (205) 326-3332
                           Email: tim@hgdlawfirm.com
                           Email: wlgarrison@hgdlawfirm.com
                           Email: chood@hgdlawfirm.com
                           Email: acarroll@hgdlawfirm.com

                           ***Attorneys for Plaintiff and putative class members***

                           *\*Admission forthcoming*